**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **AMBER S. PAYNE,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 4:11CV1295 LMB** |
| | ) | |
| **MICHAEL J. ASTRUE,** | ) | |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM

This is an action under 42 U.S.C. § 405(g) for judicial review of defendant's final decision

denying the application of Amber S. Payne for Supplemental Security Income under Title XVI of

the Social Security Act. This case has been assigned to the undersigned United States Magistrate

Judge pursuant to the Civil Justice Reform Act and is being heard by consent of the parties. <u>See</u>

28 U.S.C. § 636(c). Plaintiff filed a Brief in support of the Complaint. (Doc. No. 12). Defendant

filed a Brief in Support of the Answer. (Doc. No. 14). Plaintiff has filed a Reply. (Doc. No. 13).

## Procedural History

On October 6, 2008, plaintiff filed her application for benefits, claiming that she became

unable to work due to her disabling condition on March 3, 1979. (Tr. 107-09). This claim was

denied initially, and following an administrative hearing, plaintiff's claim was denied in a written

opinion by an Administrative Law Judge (ALJ), dated April 20, 2010. (Tr. 31-33, 37-43, 6-18).

Plaintiff then filed a request for review of the ALJ's decision with the Appeals Council of the

Social Security Administration (SSA), which was denied on June 7, 2011. (Tr. 5, 1-4). Thus, the decision of the ALJ stands as the final decision of the Commissioner. See 20 C.F.R. §§ 404.981, 416.1481.

## Evidence Before the ALJ

### A. ALJ Hearing

Plaintiff's administrative hearing was held on March 16, 2010. (Tr. 21). Plaintiff was present and was represented. (Id.). Vocational expert Maryanne Lumpky was present by telephone. (Id.).

The ALJ examined plaintiff, who testified that she was thirty-five years of age, and completed the tenth grade. (Tr. 22). Plaintiff stated that she did not have a GED. (Id.). Plaintiff testified that she tried to obtain her GED, but was unable to pass the test because she did not understand the material. (Tr. 23).

Plaintiff testified that she had not performed any work in the fifteen-year period prior to the hearing. (Id.).

Plaintiff stated that she had two children, who were aged thirteen and ten. (Id.). Plaintiff testified that both of her children attended school, and did not have special needs. (Id.).

Plaintiff stated that she had been receiving treatment at Crider Center since 2008. (Id.). Plaintiff testified that she had been receiving treatment at the Crider Center on a weekly basis until she started "school." (Tr. 24).

Plaintiff stated that she was attending a center for head injuries homework program. (Id.). Plaintiff testified that the center was assigning tasks for her to help prepare her for work. (Id.).

Plaintiff acknowledged that the center found in 2007 that she could work as a retail

salesperson, cashier, customer service person, or assembly person.  (Id.).  Plaintiff testified that she went to job sites to observe how these positions were performed, but never applied for a position.  (Id.).

Plaintiff stated that she has had problems with drugs in the past.  (Id.).  Plaintiff testified that she last used cocaine two years prior to the hearing.  (Id.).  Plaintiff stated that she last used alcohol one year prior to the hearing.  (Tr. 25).  Plaintiff testified that she has not used any other drugs in the year prior to the hearing.  (Id.).

Plaintiff stated that she was unable to work full-time because she experienced depression and anxiety.  (Id.).  Plaintiff testified that her depression and anxiety made it difficult for her to get out of bed.  (Id.).  Plaintiff stated that her mental impairments also caused her to perform work slowly.  (Id.).

Plaintiff testified that she was a single parent, and that she took care of her children.  (Id.). Plaintiff stated that she no longer lived with a boyfriend.  (Id.).

Plaintiff testified that she was unable to work due to her depression, anxiety, and head injuries.  (Id.).  Plaintiff stated that she was still going to the center for head injuries.  (Id.). Plaintiff testified that she sustained a head injury when she was four years old.  (Tr. 26).  Plaintiff stated that she first received treatment for her head injuries in 2007.  (Id.).

Plaintiff's attorney examined plaintiff, who testified that she experienced crying spells approximately twice a week.  (Id.).  Plaintiff stated that her crying spells lasted one to two hours. (Id.).

Plaintiff testified that she experienced severe headaches approximately twice a week.  (Tr. 27).  Plaintiff stated that she takes Tylenol, lies down, and applies a cold compress to her head

when these headaches occur.  (Id.).  Plaintiff testified that she did not experience any nausea or vomiting with her headaches.  (Id.).

Plaintiff stated that she lived with her parents at the time of the hearing.  (Id.).

Plaintiff testified that she attended special education classes when she was in school.  (Id.).

The ALJ then examined the vocational expert, Maryanne Lumpky.  The ALJ asked Ms. Lumpky to assume a hypothetical claimant with plaintiff's characteristics and the following limitations: able to perform a full range of light work; able to understand, remember, and carry out simple instructions and non-detailed tasks; and should not work in a setting that includes constant or regular contact with the general public.  (Tr. 28).  Ms. Lumpky testified that the claimant would be able to perform the positions of shop assembler (70,000 positions nationally, 1,300 positions regionally); housekeeper (387,000 positions nationally, 3,700 positions regionally); and folding machine operator (175,000 positions nationally, 1,000 positions regionally).  (Id.).

Plaintiff's attorney next asked Ms. Lumpky to assume a hypothetical claimant with an IQ of 73, with less than a high school education, who received special education, with no GED, and the following limitations: able to perform light duty work; had a depressed state; experienced crying spells which occur without warning and last for up to one hour twice a week; and was unable to maintain concentration, pace, and persistence at work for an eight-hour day.  (Tr. 29). Ms. Lumpky testified that there were no jobs such a person could perform.  (Id.).

## B.    Relevant Medical Records

The record reveals that plaintiff presented to Subbarao Polineni, M.D., with complaints of

wrist pain in August of 2003. (Tr. 326). Plaintiff underwent an MRI of the right wrist in

February of 2004, which was normal. (Id.). Plaintiff complained of arm and shoulder pain in June

of 2004. (Tr. 325). Plaintiff underwent an MRI scan of the cervical[1] spine in November 2004,

which revealed slight disc bulging at C4-C5, and C5-C6. (Id.). Dr. Polineni recommended that

plaintiff see a neurologist due to possible nerve compression. (Id.).

Plaintiff received psychiatric treatment from Saaid Khojasteh, M.D. and Associates from

September 2004 through July 2005. (Tr. 352-63). In September of 2004, plaintiff was diagnosed

with depression and methamphetamine abuse. (Tr. 363). Plaintiff was prescribed Lexapro[2] and

Wellbutrin.[3] (Id.). Plaintiff presented approximately monthly for medication management. (Tr.

352-63). On July 22, 2005, plaintiff was diagnosed with depression, panic attacks, and

methamphetamine abuse. (Tr. 352). Plaintiff was prescribed Paxil,[4] Trazodone,[5] Wellbutrin, and

Xanax.[6] (Id.). Plaintiff was also referred to counseling. (Id.).

---

[1]In common terms, the cervical region of the spinal column is the neck; the thoracic region is the main part of the back; and the lumbar region is the lower back. There are seven cervical vertebrae, twelve thoracic vertebrae, and five lumbar vertebrae. The sacrum lies directly below the fifth lumbar vertebra. The coccyx, or tail bone, lies below the sacrum. See Medical Information Systems for Lawyers, § 6:27.

[2]Lexapro is an antidepressant indicated for the treatment of major depressive disorder. See Physician's Desk Reference, ("PDR"), 1175 (63rd Ed. 2009).

[3]Wellbutrin is an antidepressant indicated for the treatment of major depressive disorder. See PDR at 1648-49.

[4]Paxil is an antidepressant indicated for the treatment of major depressive disorder, panic disorder, and generalized anxiety disorder. See PDR at 1536-37.

[5]Trazodone is an antidepressant drug indicated for the treatment of depression and other mood disorders. See WebMD, http://www.webmd.com/drugs (last visited August 27, 2012).

[6]Xanax is indicated for the treatment of anxiety and panic disorders. See WebMD, http://www.webmd.com/drugs (last visited August 27, 2012).

Plaintiff was admitted at St. Joseph's Health Center from June 8, 2006, through June 12, 2006, due to an overdose of Donnatal.[7] (Tr. 365). Plaintiff had taken an unknown amount of Donnatal after a fight with her boyfriend and stepmother. (Id.). Plaintiff was evaluated by a psychiatrist, who found that plaintiff had difficulty comprehending to some degree, and that her memory was below normal. (Tr. 367). Plaintiff was diagnosed with depressive disorder not otherwise specified;[8] history of methamphetamine and cocaine abuse; borderline intellectual functioning;[9] and a GAF[10] score of 40.[11] (Id.). Plaintiff was stabilized on Prozac.[12] (Id.). Plaintiff's discharge diagnoses were depression, not otherwise specified; methamphetamine and cocaine abuse; borderline intellectual functioning; and a GAF score of 50.[13] (Id.). Plaintiff was

_____

[7]Donnatal is indicated in the treatment of irritable bowel syndrome. See PDR at 2507.

[8]Depressive Disorder Not Otherwise Specified (NOS) denotes disorders with depressive features that do not meet the criteria for Major Depressive Disorder, Dysthymnic Disorder, or Adjustment Disorder. See Diagnostic and Statistical Manual of Mental Disorders (DSM-IV), 350 (4th Ed. 1994).

[9]Borderline intellectual functioning is defined by an IQ in the 71-84 range. DSM-IV at 684.

[10]The Global Assessment of Functioning Scale (GAF) is a psychological assessment tool wherein an examiner is to "[c]onsider psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness" which does "not include impairment in functioning due to physical (or environmental) limitations." DSM-IV at 32.

[11]A GAF score of 31-40 denotes some impairment in reality testing or communication (e.g., speech is at time illogical, obscure, or irrelevant) OR major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., depressed man avoids friends, neglects family, and is unable to work). DSM-IV at 32.

[12]Prozac is an antidepressant indicated for the treatment of major depressive disorder. See PDR at 1854.

[13]A GAF score of 41 to 50 indicates "serious symptoms" or "any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." DSM-IV at 32.

prescribed Prozac, and was instructed to follow-up at Crider Center. (Id.).

Plaintiff presented to New Melle Clinic on August 27, 2007, with complaints of increased depression. (Tr. 409). Plaintiff reported that she had run out of Prozac, had no insurance coverage, and was experiencing difficulty functioning without medication. (Id.). It was noted that plaintiff's affect was flat. (Id.). Plaintiff was diagnosed with depression, and was prescribed Prozac. (Id.). On September 17, 2007, plaintiff reported that her depression improved with medication, but she was experiencing anxiety attacks. (Tr. 408). Plaintiff was prescribed Xanax. (Id.). On September 27, 2007, plaintiff complained of depression, with increased crying spells. (Tr. 407). Plaintiff's dosage of Prozac was increased. (Id.). On October 25, 2007, plaintiff complained of depression and low back pain. (Tr. 406).

Plaintiff presented to The Center for Head Injury Services for a Comprehensive Vocational Evaluation on October 29, 2007, to determine plaintiff's suitable vocational goals, strengths and impediments, compensatory strategies, level of insight, and level of work readiness. (Tr. 410). In a final report dated November 23, 2007, it was found that plaintiff had below average short-term memory, and decreased work-related skills in areas such as follow-through on tasks, initiation, punctuality, concentration, and decreased productivity. (Tr. 411). Plaintiff demonstrated well below average abilities on arithmetic and average reading abilities on functional testing. (Tr. 414). It was noted that plaintiff should avoid positions that require quick processing speed and multi-tasking, high productivity, or operating a cash register or providing change. (Tr. 412). It was found that plaintiff should pursue positions that allow for hands on demonstrations such as retail work, filing or assembly work; or positions that do not require quick response time such as customer service or cashier. (Id.). It was recommended that plaintiff participate in the

Comprehensive Rehabilitative Services (CRS) program in order to continue career exploration, enroll in case management services, and receive counseling services. (Tr. 416). Plaintiff participated in the CRS program in November and December of 2007. It was found that plaintiff's production speed was consistently thirty percent less than others working with her on the same projects. (Tr. 422). Plaintiff's other limitations were identified as her decreased self-esteem, and difficulty with short-term memory. (Id.).

Plaintiff presented to Omar Quadri, M.D. at the Crider Health Center for an initial assessment on April 8, 2008. (Tr. 436-37). Plaintiff complained of depressed mood and anxiety in the context of significant alcohol and drug abuse and involvement in an abusive relationship. (Tr. 436). Plaintiff reported sleep disturbance, poor appetite, low energy, fleeting hopelessness and low self-esteem, and history of fleeting suicidal thoughts when confronted with stressors. (Id.). Plaintiff indicated that she had an extensive history of alcohol and drug abuse, and that she last drank three to four days prior, and last used cocaine and marijuana one month prior. (Id.). Upon mental status examination, plaintiff appeared intellectually slow and childish, with difficulties comprehending complex concepts. (Id.). Plaintiff's mood was depressed, her affect was euthymic, and her insight and judgment were poor. (Id.). Dr. Quadri diagnosed plaintiff with alcohol and polysubstance dependence, mood disorder not otherwise specified, and borderline intellectual functioning. (Id.). Dr. Quadri started plaintiff on Lexapro. (Id.).

Plaintiff saw Dr. Quadri on April 29, 2008, at which time she reported that she felt depressed because of her current abusive relationship but denied having any suicidal or homicidal thoughts. (Tr. 438). Plaintiff indicated that she had not consumed alcohol in one week because she had her kids with her. (Id.). Dr. Quadri increased plaintiff's dosage of Lexapro, and

encouraged plaintiff to get out of her abusive relationship and go to rehab to achieve sobriety. (Id.).

Plaintiff saw Dr. Quadri on June 10, 2008, at which time she reported that she had gone to rehab for four weeks, and had been sober from alcohol for over one month, and clean from cocaine for over three months. (Tr. 439). Plaintiff reported feeling stress due to her relationship with her parents. (Id.). Upon examination, plaintiff's affect was bright and euthymic, and plaintiff reported no irritability or mood swings. (Id.). Dr. Quadri discontinued plaintiff's Lexapro and replaced it with Prozac at plaintiff's request. (Id.).

On July 8, 2008, plaintiff indicated that she had started drinking alcohol again with her alcoholic and abusive boyfriend. (Tr. 440). Plaintiff reported that she did not feel happy because she was "dealing with stuff." (Id.). Dr. Quadri again advised plaintiff to get out of her abusive relationship and attend counseling to achieve sobriety. (Id.).

Plaintiff presented to Elbert H. Cason, M.D., for a general medicine evaluation on December 12, 2008. (Tr. 450-53). Plaintiff's chief complaints were listed as brain damage due to head injury, headaches, and pains in arms and neck. (Tr. 450). Plaintiff reported that she had experienced headaches since being struck by a car at age four, and that they occur several times a day and last for several hours. (Tr. 453). Upon physical examination, Dr. Cason found no evidence of any neurological abnormality, sensory, motor or reflex abnormality, muscle atrophy, or muscle spasms. (Tr. 452). Plaintiff had tenderness in the left side of her neck, posteriorly and laterally, but full head and neck motions were present. (Id.). Dr. Cason found no evidence of any trigger points or pressure points causing any headaches. (Id.). Plaintiff was wearing a velcro splint to her left wrist, yet Dr. Cason found no evidence of any muscle or bone damage to either

upper extremity, or evidence of carpal tunnel syndrome in the wrists or hands. (Tr. 453).

Plaintiff presented to L. Lynn Mades, Ph.D., licensed psychologist, for a psychological evaluation, on December 12, 2008. (Tr. 457-62). Plaintiff's chief complaint was "I guess I can't understand everything or whatever, I'm too slow." (Tr. 457). Plaintiff complained of depression, with symptoms of sleeping most of the day and crying spells; and anxiety. (Id.). Plaintiff reported that her last use of alcohol was two weeks prior, at which time she drank two twenty-four-ounce beers. (Tr. 458). Plaintiff's last reported use of cocaine was nine months prior. (Id.). Plaintiff indicated that she was attending AA once per week, and had a sponsor, but indicated that she was not working any steps. (Id.). Upon mental status examination, plaintiff appeared somewhat "spacey" and it was questionable whether plaintiff might be under the influence of something sedating, although she denied such use. (Tr. 459). Plaintiff's mood was euthymic and her affect was restricted and generally appropriate. (Id.). No mood disturbance was apparent. (Id.). Plaintiff's memory appeared to be within normal limits, and her insight and judgment appeared to be slightly limited. (Tr. 460). Dr. Mades administered the Wechsler Adult Intelligence Scale Third Edition (WAIS-III), which revealed a Verbal IQ of 79, a Performance IQ of 80, and a Full Scale IQ of 78, which placed plaintiff in the borderline range of cognitive functioning. (Id.). With regard to plaintiff's daily functioning, plaintiff reported that she was able to perform activities of daily living; got along adequately with others, with limited socialization noted; took care of her personal needs; and demonstrated during the exam the ability to maintain adequate attention and concentration, with appropriate persistence and pace. (Tr. 461). Dr. Mades diagnosed plaintiff

with mood disorder NOS, alcohol abuse, polysubstance abuse, and a GAF score of 75.[14] (Id.).

Dr. Mades stated that plaintiff described some symptoms of depression and anxiety; however, this

is complicated by substance abuse, about which the clamant does not appear to be a fully reliable

informant. (Id.). Dr. Mades stated that no evidence of thought disturbance was noted during the

examination, and there was evidence of mild mood impairment by history and presentation. (Id.).


Kyle DeVore, Ph.D., a non-examining state agency psychologist, completed a Psychiatric

Review Technique on January 23, 2009. (Tr. 464-75). Dr. DeVore expressed that plaintiff had

moderate limitations in her ability to maintain concentration, persistence, or pace; and mild

limitations in her activities of daily living, and ability to maintain social functioning. (Tr. 472).

Dr. DeVore also completed a Mental Residual Functional Capacity Assessment, in which he

found that plaintiff had moderate limitations in her ability to understand and remember detailed

instructions; carry out detailed instructions; maintain attention and concentration for extended

periods; complete a normal workday and workweek without interruptions from psychologically-

based symptoms and perform at a consistent pace without an unreasonable number and length of

rest periods; accept instructions and respond appropriately to criticism from supervisors; respond

appropriately to changes in the work setting; and set realistic goals or make plans independently

of others. (Tr. 476-77).

A Residual Functional Capacity assessment was submitted by plaintiff's counsel. (Tr. 446-

---

[14]A GAF score of 71 to 80 denotes "[i]f symptoms are present, they are transient and
expectable reactions to psychosocial stressors (e.g., difficulty concentrating after family
argument); no more than slight impairment in social, occupational, or school functioning (e.g.,
temporarily falling behind in schoolwork)." DSM-IV at 32.

48).  Plaintiff contends that the author of the assessment was Dr. Quadri.[15]  Dr. Quadri indicated

that plaintiff's diagnosis was depression NOS, borderline intellectual functioning, and a GAF

score of 55.[16]  (Tr. 446).  Dr. Quadri listed plaintiff's symptoms as depression, appetite

disturbance, pervasive loss of interest, hostility, and irritability.  (Id.).  Dr. Quadri expressed the

opinion that plaintiff had poor or no mental ability to perform any of the functions necessary for

even unskilled work.  (Tr. 447).  For example, Dr. Quadri found that plaintiff had poor or no

ability to understand and remember very short simple instructions, maintain attention for two hour

segments, maintain regular attendance and be punctual, sustain an ordinary routine without special

supervision, complete a normal workday and workweek without interruptions from

psychologically based symptoms, get along with co-workers or peers without unruly distracting

them or exhibiting behavioral extremes, and deal with normal work stress.  (Id.).

Plaintiff presented to Vincent F. Stock, M.A., licensed psychologist, on December 8,

2009, for a psychological evaluation.  (Tr. 515-24).  Plaintiff reported feeling anxious six out of

seven days, and depressed five out of seven days.  (Id.).  Plaintiff reported feeling sad, feeling

overwhelmed, losing interest, and crying.  (Id.).  Plaintiff reported that her memory was impaired.

(Id.).  Plaintiff's mental status examination revealed that plaintiff was cooperative, agitated in

motor activity, labile in affect, more anxious than depressed in mood by self-report, and soft and

pressured in speech.  (Tr. 522).  Plaintiff's thought process was intact but she tended to pause

---

[15]To avoid confusion, the undersigned will refer to this opinion as the opinion of Dr.
Quadri.  The undersigned will discuss the issue of who authored this opinion in detail below.

[16]A GAF score of 51-60 denotes "[m]oderate symptoms (e.g., flat affect and
circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or
school functioning (e.g., few friends, conflicts with peers or co-workers)."  DSM-IV at 32.

before answering any questions.  (Id.).  Plaintiff appeared to be disoriented as to time and place.

(Id.).  Plaintiff's cognitive functioning was intact except for simple calculations.  (Id.).  Plaintiff's

abstract capability was mixed, and her judgment and insight were intact for simple issues.  (Id.).

Plaintiff's sleep was significantly interrupted.  (Id.).  Mr. Stock administered the WAIS-IV, which

revealed a Full Scale IQ score of 73, which was in the borderline range.  (Tr. 520).  Mr. Stock

found the test results to be a valid estimate of plaintiff's intellectual ability.  (Tr. 522).  Mr. Stock

diagnosed plaintiff with dysthymic disorder;[17] polysubstance dependence, early partial remission;

borderline intellectual functioning; and a GAF score of 40.  (Tr. 523).  Mr. Stock found that

plaintiff had marked limitations in her activities of daily living, social functioning and deterioration

or decompensation in work or work-like setting.  (Tr. 523).  Mr. Stock indicated that plaintiff had

moderate limitations in her concentration, persistence, or pace.  (Id.).  Mr. Stock noted that

plaintiff had not worked since 1994, and that her work experience was meager at best.  (Id.).  Mr.

Stock noted that plaintiff had attended a three-week evaluation in 2007, and was assessed as not

placeable or capable of competitive employment without completing many recommended courses

of action.  (Id.).  Mr. Stock concluded that plaintiff's limitations were significant, and that she was

not able to secure or maintain a full-time position of employment on the open labor market due to

the combination of her limitations.  (Id.).

### The ALJ's Determination

The ALJ made the following findings:

1.      The record supports a finding that the claimant has not performed any substantial
        work activity during the pertinent period.  (20 CFR 416.920(b), and 416.971 *et*

---

[17]A chronic disturbance of mood characterized by mild depression or loss of interest in
usual activities.  Stedman's at 569.

*seq.*).

2.    The claimant has the following "severe" impairments: borderline intellectual functioning; chronic low back pain of unknown etiology; and a mood disorder, not otherwise specified. The claimant alleges headaches which are considered to be "non-severe." (20 CFR 416.920(c)).

4.    The claimant does not have an impairment or combination of impairments that meet or medically equal one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1. (20 CFR 416.920(d), 416.925 and 416.926). Therefore, a decision will be based upon the objective medical evidence of record and vocational factors.

5.    The undersigned finds that the claimant could perform a full range of light work with the ability to understand, remember and carry out simple instructions and non-detailed tasks and is restricted from working in constant/regular contact with the general public.

6.    The claimant's allegations and testimony are not fully credible.

7.    The claimant has no past relevant work. (20 CFR 416.965).

8.    The claimant is considered a "younger individual." (20 CFR 416.963).

9.    The claimant has a "limited" 11th grade education with special education courses. (20 CFR 416.964).

10.    Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills. (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

11.    Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the regional and/or national economy that the claimant can perform. (20 CFR 416.960(c), and 416.966).

12.    The claimant has not been under a disability, as defined in the Social Security Act, at any time pertinent to this proceeding. (20 CFR 416.920(g)).

(Tr. 11-17).

The ALJ's final decision reads as follows:

Based on the application protectively filed for supplemental security income October 6, 2008, the claimant is not disabled under section 1614(a)(3)(A), of the Social Security Act, as amended.

The undersigned recommends that counsel assist the claimant by contacting Vocational Rehabilitation for any services she may qualify for in an effort to achieve employment and self-sufficiency.

(Tr. 18).

## Discussion

**A.   Standard of Review**

Judicial review of a decision to deny Social Security benefits is limited and deferential to the agency. See Ostronski v. Chater, 94 F.3d 413, 416 (8th Cir. 1996). The decision of the SSA will be affirmed if substantial evidence in the record as a whole supports it. See Roberts v. Apfel, 222 F.3d 466, 468 (8th Cir. 2000). Substantial evidence is less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a conclusion. See Kelley v. Callahan, 133 F.3d 583, 587 (8th Cir. 1998). If, after review, it is possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, the denial of benefits must be upheld. See Robinson v. Sullivan, 956 F.2d 836, 838 (8th Cir. 1992). The reviewing court, however, must consider both evidence that supports and evidence that detracts from the Commissioner's decision. See Johnson v. Chater, 87 F.3d 1015, 1017 (8th Cir. 1996). "[T]he court must also take into consideration the weight of the evidence in the record and apply a balancing test to evidence which is contrary." Burress v. Apfel, 141 F.3d 875, 878 (8th Cir. 1998). The analysis required has been described as a "searching inquiry." Id.

**B.      The Determination of Disability**

The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 416 (I) (1) (a); 42 U.S.C. § 423 (d) (1) (a).  The claimant has the burden of proving that s/he has a disabling impairment.  See Ingram v. Chater, 107 F.3d 598, 601 (8th Cir. 1997).

The SSA Commissioner has established a five-step process for determining whether a person is disabled.  See 20 C.F.R. §§ 404.1520, 416.920; Bowen v. Yuckert, 482 U.S. 137, 141-42, 107 S. Ct. 2287, 2291, 96 L. Ed. 2d. 119 (1987); Fines v. Apfel, 149 F.3d 893, 894-895 (8th Cir. 1998).  First, it is determined whether the claimant is currently engaged in "substantial gainful employment."  If the claimant is, disability benefits must be denied. See 20 C.F.R. §§ 404.1520, 416.920 (b).  Step two requires a determination of whether the claimant suffers from a medically severe impairment or combination of impairments.  See 20 C.F.R §§ 404.1520 (c), 416.920 (c).  To qualify as severe, the impairment must significantly limit the claimant's mental or physical ability to do "basic work activities."  Id.  Age, education and work experience of a claimant are not considered in making the "severity" determination.  See id.

If the impairment is severe, the next issue is whether the impairment is equivalent to one of the listed impairments that the Commissioner accepts as sufficiently severe to preclude substantial gainful employment.  See 20 C.F.R. §§ 404.1520 (d), 416.920 (d).  This listing is found in Appendix One to 20 C.F.R. 404.  20 C.F.R. pt. 404, subpt. P, App. 1.  If the impairment meets or

equals one of the listed impairments, the claimant is conclusively presumed to be impaired. See 20 C.F.R. §§ 404.1520 (d), 416.920 (d). If it does not, however, the evaluation proceeds to the next step which inquires into whether the impairment prevents the claimant from performing his or her past work. See 20 C.F.R. § 404.1520 (e), 416.920 (e). If the claimant is able to perform the previous work, in consideration of the claimant's residual functional capacity (RFC) and the physical and mental demands of the past work, the claimant is not disabled. See id. If the claimant cannot perform his or her previous work, the final step involves a determination of whether the claimant is able to perform other work in the national economy taking into consideration the claimant's residual functional capacity, age, education and work experience. See 20 C.F.R. §§ 404.1520 (f), 416.920 (f). The claimant is entitled to disability benefits only if s/he is not able to perform any other work. See id. Throughout this process, the burden remains upon the claimant until s/he adequately demonstrates an inability to perform previous work, at which time the burden shifts to the Commissioner to demonstrate the claimant's ability to perform other work. See Beckley v. Apfel, 152 F.3d 1056, 1059 (8th Cir. 1998).

The Commissioner has supplemented this five-step process for the evaluation of claimants with mental impairments. See 20 C.F.R. §§ 404.1520a (a), 416.920a (a). A special procedure must be followed at each level of administrative review. See id. Previously, a standard document entitled "Psychiatric Review Technique Form" (PRTF), which documented application of this special procedure, had to be completed at each level and a copy had to be attached to the ALJ's decision, although this is no longer required. See 20 C.F.R. §§ 404.1520a (d), (d) (2), (e), 416.920a (d), (d) (2), (e); 65 F.R. 50746, 50758. Application of the special procedures required is now documented in the decision of the ALJ or Appeals Council. See 20 C.F.R. §§ 404.1520a

(e), 416.920a (e).

**C.     Plaintiff's Claims**

Plaintiff first argues that the ALJ erred in failing to consider whether plaintiff met Listing 12.04.  Plaintiff next argues that the ALJ erred in failing to provide controlling weight to the opinion of treating physician Dr. Quadri.  Plaintiff also contends that the ALJ erred in failing to indicate what weight he afforded to the opinion of Dr. Mades and the state agency medical consultant in determining plaintiff's RFC.  Plaintiff finally argues that the ALJ erred in determining plaintiff's residual functional capacity.  The undersigned will discuss plaintiff's claims in turn, beginning with the ALJ's evaluation of the medical opinion evidence.

The ALJ found that plaintiff's severe impairments included borderline intellectual functioning; chronic low back pain of unknown etiology; and a mood disorder not otherwise specified.  (Tr. 11.)  The ALJ concluded that plaintiff was able to understand, remember and carry out simple instructions and non-detailed tasks, and was restricted from working in constant/regular contact with the general public.  (Tr. 15.)

The ALJ discussed the opinion attributed by plaintiff to Dr. Quadri.  (Tr. 14-15).  Specifically, the ALJ acknowledged that a mental residual functional capacity assessment was mailed to counsel by the Crider Center on August 27, 2009.  (Tr. 14).  The ALJ stated that the signature "is completely illegible and no determination could be made as to whether it was prepared by an acceptable medical source."  (Id.).  The ALJ discussed the findings of the opinion, including the determination that plaintiff had poor or no ability to perform any work functions.  (Tr. 14-15).  The ALJ indicated that he was according "lesser weight to this opinion as it conflicts with the overall evidence of record, is not supported by treatment records, it ignores the effects of

polysubstance abuse, and it is unknown who actually authored and signed it." (Tr. 15).

"It is the ALJ's function to resolve conflicts among the various treating and examining physicians." Pearsall v. Massanari, 274 F.3d 1211, 1219 (8th Cir. 2001). In doing so, the ALJ must explain the reasons for the determination. Coleman v. Astrue, 498 F.3d 767, 773 (8th Cir. 2007); Cruz v. Comm'r of Soc. Sec., 244 Fed. App'x 475, 479 (3d Cir. 2007). "While a deficiency in opinion-writing is not a sufficient reason to set aside an ALJ's finding where the deficiency [has] no practical effect on the outcome of the case, inaccuracies, incomplete analyses, and unresolved conflicts of evidence can serve as a basis for remand." Draper v. Barnhart, 425 F.3d 1127, 1130 (8th Cir. 2005).

In this case, the ALJ discredited the opinion of Dr. Quadri in large part because he found it was unknown who actually authored and signed the opinion. (Tr. 15). The ALJ noted that the signature was completely illegible, and no determination could be made as to whether it was prepared by an acceptable medical source. (Tr. 14). It is true that the signature on the opinion is illegible. (Tr. 445-48). The form, however, was clearly submitted by plaintiff's counsel to Dr. Quadri at Crider Health Center. (Tr. 455). As plaintiff points out, the signature appearing on each page of the opinion is consistent with the signature appearing on Dr. Quadri's treatment notes. As such, it is reasonable to conclude that the opinion was authored by Dr. Quadri.

As a treating physician,[18] Dr. Quadri's opinion would generally be given greater weight

---

[18]"Treating physicians are defined broadly by the regulations as any physician who has provided the claimant with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with the claimant." Dewald v. Astrue, 590 F. Supp. 2d 1184, 1200 (D.S.D. 2008). Although defendant argues that Dr. Quadri only saw plaintiff three times, a physician "need not provide treatment at all times to be considered a treating physician." Id. Even if Dr. Quadri was only an examining physician, his opinions "were entitled to more weight than nonexamining sources." Id. at 1201; 20 C.F.R. §§ 404.1527(d)(1); 416.927(d)(1).

than that of a non-treating physician. Dewald v. Astrue, 590 F. Supp. 2d 1184, 1200 (D.S.D. 2008); 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2). The ALJ must provide "good reason" for not crediting the opinion of a treating physician. 20 C.F.R. §§ 404.1527(d)(2).

The ALJ also discredited Dr. Quadri's opinion because he found that it was inconsistent with the overall record and ignored the effects of polysubstance abuse. This finding, however, is not supported by substantial evidence. Plaintiff presented to Dr. Quadri for an initial assessment on April 8, 2008. (Tr. 436-37). Plaintiff complained of depressed mood and anxiety "in the context of significant alcohol and drug abuse and involvement in an abusive relationship." (Tr. 436). Plaintiff reported symptoms of sleep disturbance, poor appetite, low energy, fleeting hopelessness and low self-esteem, and a history of fleeting suicidal thoughts when confronted with stressors. (Id.). Dr. Quadri found that plaintiff appeared intellectually slow and childish, with difficulties comprehending complex concepts, had a depressed mood, euthymic affect, and poor insight and judgment. (Id.). Dr. Quadri diagnosed plaintiff with alcohol and polysubstance dependence, mood disorder not otherwise specified, and borderline intellectual functioning. (Id.). He prescribed Lexapro. (Id.). On April 29, 2008, plaintiff reported depression due to her abusive relationship. (Tr. 438). Dr. Quadri increased plaintiff's dosage of Lexapro. (Id.). Plaintiff saw Dr. Quadri in June and July of 2008, at which time he continued to adjust plaintiff's medications, and advised her to get out of her abusive relationship and achieve sobriety. (Tr. 439-440). Dr. Quadri's treatment notes reveal that plaintiff suffered from significant psychiatric symptoms, and that Dr. Quadri was aware of plaintiff's polysubstance abuse. As such, his opinion is consistent with his own treatment notes.

Dr. Quadri's opinion is also consistent with the other evidence of record. Plaintiff

received psychiatric treatment from Saaid Khojasteh, M.D. and Associates from September 2004 through July 2005. (Tr. 352-63). Plaintiff was diagnosed with depression and panic attacks, and was prescribed multiple psychiatric medications. Plaintiff was admitted at St. Joseph's Health Center from June 8, 2006, through June 12, 2006, due to a drug overdose. (Tr. 365). Plaintiff was diagnosed with depressive disorder not otherwise specified; history of methamphetamine and cocaine abuse; borderline intellectual functioning, and a GAF score of 40. (Tr. 367). It was also noted by the examining psychiatrist that plaintiff had difficulty comprehending and that her memory was below normal. (Id.). Plaintiff was stabilized on Prozac, and was given a GAF score of 50 upon discharge. (Id.). Plaintiff received treatment at the New Melle Clinic from August of 2007 through October of 2007 for complaints of increased depression with crying spells, and anxiety attacks. (Tr. 406-09). Plaintiff received medication management. (Id.). Consultative examiner Mr. Stock diagnosed plaintiff with dysthymic disorder, and borderline intellectual functioning, and assessed a GAf score of 40. (Tr. 523). Mr. Stock expressed the opinion that plaintiff had significant limitations, which would preclude full-time employment on the open labor market. (Tr. 523). In addition, records from the Center for Head Injury Services reveal that plaintiff had difficulty with short-term memory, decreased work-related skills, decreased self-esteem, and low production speed. (Tr. 411). The evidence of record reveals that plaintiff suffered from significant psychiatric symptoms as a result of her mental impairments.

Defendant argues that it does not appear that Dr. Quadri completed the opinion at issue. Defendant argues that the signature is impossible to interpret. Defendant also points out that the author indicated that he first saw plaintiff on August 19, 2009, less than one month prior to the date of the assessment, whereas Dr. Quadri started seeing plaintiff in 2008.

The ALJ's duty to develop the record fully and fairly includes a duty to recontact a treating physician for clarification when "a crucial issue is undeveloped." Ellis v. Barnhart, 392 F.3d 988, 994 (8th Cir. 2005). See also 20 C.F.R. § 404.1512(e)(1) ("We will seek additional evidence or clarification from your medical source when the report from your medical source contains a conflict or ambiguity that must be resolved, the report does not contain all the necessary information, or does not appear to be based on medically acceptable clinical and laboratory diagnostic techniques.")

The undersigned agrees with defendant that there are questions regarding the opinion attributed to Dr. Quadri. If the assessment was authored by Dr. Quadri, it was the only opinion provided by a treating source. The assessment was consistent with Dr. Quadri's treatment notes as well as the remainder of the medical record, and found that plaintiff had limitations which would preclude employment. Under these circumstances, the undersigned finds that the ALJ had the duty to re-contact Dr. Quadri for clarification. If the opinion was authored by Dr. Quadri, then it is entitled to significant weight.

Plaintiff also argues that the ALJ erred in determining plaintiff's RFC. Plaintiff contends that the RFC formulated by the ALJ is not supported by the medical evidence. Plaintiff argues that the ALJ also failed to indicate the weight assigned to the opinions of consultative psychologist Dr. Mades, and non-examining state agency psychologist Dr. DeVore. Determination of residual functional capacity is a medical question and at least "some medical evidence 'must support the determination of the claimant's [residual functional capacity] and the ALJ should obtain medical evidence that addresses the claimant's ability to function in the workplace.'" Hutsell v. Massanari, 259 F.3d 707, 712 (8th Cir. 2001) (quoting Lauer v. Apfel,

245 F.3d 700, 704 (8th Cir. 2001)).

The undersigned has found that the ALJ erred in discrediting the opinion attributed to Dr. Quadri without re-contacting this treating source. As such, the case must be remanded to the ALJ to obtain clarification regarding the author of the opinion attributed to Dr. Quadri, and to provide a complete analysis of the weight given to the remainder of the medical opinion evidence. See, e.g., Love v. Astrue, 2008 WL 877762, at *4-5 (E.D. Ark. Mar. 26, 2008) (remanding because the ALJ's decision was deficient in failing to explain her reasons for disagreeing with medical evidence); Anderson v. Barnhart, 312 F. Supp. 2d 1187, 1194 (E.D. Mo. 2004) (remanding because ALJ did not discuss or give good reason for the weight given to treating physician's opinion). If the residual functional capacity opinion provided by the Crider Center was authored by Dr. Quadri, then the RFC formulated by the ALJ is not supported by substantial evidence.

Plaintiff finally argues that the ALJ erred in failing to consider whether plaintiff meets or equals Listing 12.04, the listing for affective disorders. The burden of proof is on the plaintiff to establish that his or her impairment meets or equals a listing. Johnson v. Barnhart, 390 F.3d 1067, 1070 (8th Cir. 2004). To meet a listing, an impairment must meet all of the listing's specified criteria. Id. An impairment that manifests only some of these criteria, no matter how severely, does not qualify. Id. (quoting Sullivan v. Zebley, 493 U.S. 521, 530-31(1990)). Although it is preferable that ALJs address a specific listing, failure to do so is not reversible error if the record supports the overall conclusion. Pepper ex rel Gardner v. Barnhart, 342 F.3d 853, 855 (8th Cir. 2003).

The ALJ in this case did not specifically address whether plaintiff met or equaled listing

12.04. The residual functional capacity opinion attributed to Dr. Quadri is supportive of plaintiff's claim that her condition meets listing 12.04. After the ALJ re-contacts Dr. Quadri, the ALJ should determine whether plaintiff's condition meets or equals listing 12.04.

## Conclusion

In sum, the undersigned finds that the ALJ erred in evaluating the opinion attributed by plaintiff to Dr. Quadri. As such, this cause will be reversed and remanded to the ALJ in order for the ALJ to re-contact Dr. Quadri; indicate the weight he is assigning to the opinions of Drs. Mades and DeVore; determine whether plaintiff's condition meets or equals listing 12.04; and, if necessary, reassess plaintiff's residual functional capacity based on the developed record. Accordingly, a Judgment of Reversal and Remand will be entered separately in favor of plaintiff in accordance with this Memorandum.

Dated this  18th  day of September, 2012.

_Lewis M. Blanton_
LEWIS M. BLANTON
UNITED STATES MAGISTRATE JUDGE